HOFFMAN & FORDE, ATTORNEYS AT LAW
DANIEL R. FORDE (248461)
3033 Fifth Avenue, Suite 225
San Diego, CA 92103
Telephone: (619) 546-7880
Facsimile: (619) 546-7881
dforde@hoffmanforde.com

POLEK LAW
FRANK J. POLEK (167852)
701 B Street, suite 1110
San Diego, CA 92101
Telephone: (619) 550-2455
Facsimile: (619) 274-8166
frank@poleklaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UN BOON KIM, on behalf of Herself, All Others Similarly Situated and the General Public;<br><br>        Plaintiffs,<br>v.<br><br>SHELLPOINT PARTNERS, LLC dba SHELLPOINT MORTGAGE SERVICING,<br><br>        Defendants. | Case No.: 15-cv-00611-LAB-BLM<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1. **VIOLATIONS OF THE TRUTH IN LENDING ACT;**<br>2. **VIOLATIONS OF CALIFORNIA CIVIL CODE SECTION 2924.11;**<br>3. **BREACH OF WRITTEN CONTRACT;**<br>4. **VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200; AND**<br>5. **DECLARATORY RELIEF**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Un Boon Kim ("Plaintiff" or "Kim") brings this action on behalf of herself and all others similarly situated against defendant Shellpoint Partners, LLC dba Shellpoint Mortgage Servicing ("Shellpoint" or "Defendant"). Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.    This action seeks redress for damages caused by Shellpoint's numerous violations of California and Federal laws related to home mortgages and Shellpoint's breaches of loan modification agreements.

2.    Shellpoint's improper practices include, among other things: (a) charging foreclosure fees in violation law; (b) failing to provide consumers with accurate, complete and lawful monthly periodic mortgage statements; and (c) failing to comply with loan modification agreements. As a result, Plaintiff and others similarly situated suffered substantial economic harm.

## JURISDICTION AND VENUE

3.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331 because a substantial part of this action arises under the laws of the United States.

4.    This Court also has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

5.    This Court also has jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

6.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that many of the acts and transactions giving rise to this action occurred in this district and because Shellpoint:

(a) is authorized to conduct business in this district and has intentionally availed itself of the laws and markets within this district;

(b) does substantial business in this district; and

(c) is subject to personal jurisdiction in this district.

## THE PARTIES

7. At all times relevant, Plaintiff is a citizen of the State of California. Plaintiff resides in San Diego County, California. At all times relevant herein, Plaintiff owned a single-family residence, located within the City San Diego ("Subject Property").

8. Shellpoint is a mortgage lender and servicer with headquarters in Greenville, South Carolina. On information and belief, Plaintiff alleges that Shellpoint is a citizen of the State of Georgia. California represents approximately 25% of Shellpoint's business, which totals nearly $11.35 billion in loans.

9. Shellpoint produces mortgage loans on a national scale and generally performs the ongoing servicing functions related to the mortgage loans that it produces. Shellpoint also purchases mortgages sold on the secondary market and services the mortgages it purchases. Shellpoint at times modifies, refinances, or otherwise changes the mortgages it produces and/or services. Shellpoint is responsible, in whole or in part, for the wrongs alleged herein.

## FACTUAL ALLEGATIONS

10. On or about March 17, 2004, Plaintiff and her late husband took out a home loan for approximately $400,000.00 ("the Loan") and signed a promissory note. On information and belief, the Loan and related documents (including the deed of trust securing the Loan) are standardized adhesionary contracts prepared, approved, or purchased by Shellpoint and are exemplars of those entered into by members of the class.

11.     The Loan was originally secured by a deed of trust lien on the Subject Property in favor of Moneyline Lending Services, Inc.  On information and belief, Plaintiff alleges that Moneyline Lending Services is no longer in business and was not in business during the relevant time periods herein, and has had its corporate status revoked by the State of Tennessee, in which it was incorporated.

12.     On information and belief, Plaintiff alleges that Shellpoint never provided Plaintiff with any alternative address to which notices should be provided.  As such, any obligation Plaintiff may have had to give notice to Moneyline Lending Services or to Shellpoint prior to initiating this lawsuit has been excused, or its performance frustrated, or its performance made impossible.

13.     Subsequently, the Loan was transferred and/or sold to Bank of America, N.A., which later transferred and/or sold the Loan to Resurgent Mortgage Servicing.  Resurgent Mortgage Servicing then transferred and/or sold the Loan to Shellpoint on or about February 2014.  Beginning in or around February 2014, Shellpoint owned and serviced the Loan.

14.     Beginning in or about June 2013, and in response to information touting loan modification and other loss mitigation programs, Plaintiff started to communicate with the owners and/or servicers of the Loan regarding her options. In this regard, Plaintiff submitted a detailed loan modification application with Bank of America in or about June 2013.  Thereafter, Plaintiff's Loan was transferred/sold to Resurgent Mortgage Servicing in or about January 2014 and Plaintiff again submitted a detailed loan modification application with Resurgent Mortgage Servicing in or about January 2014.  Thereafter, in or about February 2014, Plaintiff's Loan was transferred/sold to Shellpoint.  Plaintiff submitted a detailed loan modification application with Shellpoint in or about February 2014. Plaintiff worked diligently to ensure that Bank of America, Resurgent Mortgage Servicing, and thereafter Shellpoint received the documents requested of her and asked the lenders countless times whether further documents were required.

Eventually, Plaintiff was approved for the Home Affordable Modification Program on or about August 22, 2014.

15.     On or about August 29, 2014, Plaintiff executed and submitted the executed Home Affordable Modification Agreement to Shellpoint, receipt of which was confirmed in writing by Shellpoint on or about October 1, 2014, a true and correct copy of which is attached hereto as "Exhibit 1" ("the Modification"). On information and belief, Plaintiff alleges that the Modification is an exemplar of those of the class as alleged herein.

16.     The Modification specified the regular payments to be paid each month, and that any prior late charges, fees, principal payments, etc., would be capitalized into the principal balance of the Loan as of the effective date of the Modification.

17.     The Modification further provides that the interest rate on the Loan will increase over time, and the regular monthly payments will adjust accordingly.

18.     On information and belief, Plaintiff alleges that Shellpoint is the current lienholder on the Subject Property and Plaintiff's creditor.  In the Modification, Shellpoint identifies the "Current Lender Name" as "Shellpoint Mortgage Servicing" (Exhibit 1).  The "Home Affordable Modification Agreement" also identifies Shellpoint as the actual lender.  It states, "Lender or Servicer ("Lender"):  Shellpoint Mortgage Servicing ("Shellpoint")" (Exhibit 1). Shellpoint never identifies itself in the Modification as merely a servicer for another lender.

19.     Furthermore, in a Voluntary Lien Report provided by Shellpoint (a true and correct copy of which is attached hereto as "Exhibit 2"), Shellpoint is identified as the lender on the Subject Property.

20.     On or about November 15, 2014, Shellpoint sent plaintiff a regular monthly statement reflecting the modified terms of the mortgage.  However, included in the amount due by December 1, 2014 was a $250.00 charge entitled

"Total Fees and Charges" and described as a "Trustee Asses" (hereinafter the "Foreclosure Fee"). The monthly statement provided that payments of the Foreclosure Fee along with the regular monthly mortgage payment were due on or before December 1, 2014, and an unspecified late fee may be assessed after December 16, 2014. A true and correct copy of the December 2014 monthly mortgage statement is attached hereto as "Exhibit 3."

21. On information and belief, Plaintiff alleges that Exhibit 3 and the subsequent mortgage statements discussed below are exemplars of those given by Shellpoint to the class.

22. In order to obtain an explanation for the Foreclosure Fee, Shellpoint was contacted via telephone on December 2, 2014. A representative of Shellpoint named "Noah" explained that the Foreclosure Fee related to Shellpoint's "legal fees for the foreclosure." Knowing that no foreclosure had occurred, the charge was protested. Noah then indicated that the Loan was "referred to an attorney for foreclosure on August 17, 2014" and that even though Shellpoint never foreclosed, Plaintiff was still responsible for "the associated legal fees up to the point of modification." On information and belief, Shellpoint was not actually charged for the Foreclosure Fee and did not incur any out-of-pocket costs related to the purported "foreclosure" until at least November 2014.

23. On information and belief, Plaintiff alleges that the conversation with Noah at Shellpoint was recorded and/or the substance of the call was written into a note taking system for Shellpoint's customer service agents.

24. Not wanting to become delinquent on her monthly mortgage obligations, Plaintiff remitted her regular December 2014 payment as well as the Foreclosure Fee to Shellpoint on December 10, 2014.

25. The December 2014 monthly statement did not state that the interest rate and monthly payment would increase, and it did not state the date of the next interest rate change, as is specified in the Modification. The December 2014

monthly statement also did not state the amount of any late fee should the regular payment due on this statement not be paid by a date certain.

26.     On or about December 16, 2014, Shellpoint sent to Plaintiff her monthly mortgage statement for the month of January 2015.  A true and correct copy of this monthly statement is attached as "Exhibit 4."  The January 2015 statement confirmed receipt of Plaintiff's December 2014 regular payment as well as the Foreclosure Fee paid on December 10, 2014.  However, this statement now referred to the payment of the Foreclosure Fee as a "Principal Only Payment."  The January 2015 monthly statement showed a $250 Overdue Payment (the "Overdue Payment"), effectively charging Plaintiff a monthly payment in excess of that specified in the Modification.  The monthly statement provides that Plaintiff's January 2015 "Regular Payment" and the Overdue Payment were due on or before January 1, 2015, and that an unspecified late fee would be charged if not received by January 16, 2015.   Shellpoint did not apply the $250 additional payment in excess of Plaintiff's regular monthly payment to the Foreclosure Fee, and continued to charge Plaintiff a regular monthly payment in excess of the amounts specified in the Modification.  Plaintiff submitted payment of her January 2015 regular payment and the Overdue Payment prior to January 16, 2015.

27.     The January 2015 monthly statement did not state that the interest rate and monthly payment would increase or the date of the next interest rate change, as is specified in the Modification. The January 2015 monthly statement also did not state the amount of any late fee should the regular payment due on this statement not be paid by a specified date.

28.     On or about January 16, 2015, Shellpoint sent Plaintiff her February 2015 monthly mortgage statement.  A true and correct copy of this monthly statement is attached as "Exhibit 5."  This statement confirmed receipt of the Overdue Payment as well as Plaintiff's regular payment made on January 12, 2015. Shellpoint did not apply the $250 additional payment to the Overdue Payment but

instead applied the additional $250 payment to the principal balance of the Loan, labeling it on the monthly statement as a "Principal Only Payment." The February 2015 monthly statement continued to show a $250 Overdue Payment, effectively charging Plaintiff a monthly payment in excess of that specified in the Modification. The monthly statement provides that Plaintiff's February 2015 "Regular Payment" and the Overdue Payment were due on or before February 1, 2015, and that an unspecified late fee would be charged if not received by February 16, 2015. Plaintiff submitted payment of her February 2015 regular payment and the new Overdue Payment prior to February 16, 2015.

29.     The February 2015 monthly statement did not state that the interest rate and monthly payment would increase or the date of the next interest rate change, as is specified in the Modification. The February 2015 monthly statement also did not state the amount of any late fee should the regular payment due on this statement not be paid by a specified date.

30.     On or about February 13, 2015, Shellpoint sent Plaintiff her March 2015 monthly mortgage statement. A true and correct copy of this monthly statement is attached as "Exhibit 6." This statement confirmed receipt of the Overdue Payment as well as Plaintiff's regular payment made on February 9, 2015. Shellpoint did not apply the $250 additional payment to the Overdue Payment but instead applied the additional $250 payment to the principal balance of the Loan, labeling it on the monthly statement as a "Principal Only Payment." The March 2015 monthly statement continued to show a $250 Overdue Payment, effectively charging Plaintiff a monthly payment in excess of that specified in the Modification. The monthly statement provides that Plaintiff's March 2015 "Regular Payment" and the Overdue Payment were due on or before March 1, 2015, and an unspecified late fee would be charged if the payment was not made by March 16, 2015. Plaintiff submitted payment of her March 2015 regular payment and the new Overdue Payment prior to March 16, 2015.

31.     The March 2015 monthly statement did not state that the interest rate and monthly payment would increase or the date of the next interest rate change, as is specified in the Modification. The March 2015 monthly statement also did not state the amount of any late fee should the regular payment due on this statement not be paid by a specified date.

32.     On or about May 13, 2015, Shellpoint sent Plaintiff her May 2015 monthly mortgage statement. A true and correct copy of this monthly statement is attached as "Exhibit 7." This statement confirmed receipt of the Overdue Payment as well as Plaintiff's regular payment made on April 7, 2015. Shellpoint finally credited Plaintiff's prior April 7, 2015 $250 Overdue Payment to the illegal Foreclosure Fee (even though this was illegal but in any event was to be capitalized into the principal balance of Plaintiff's Loan pursuant to the terms of the Modification), improperly applied another $250 payment to principal, and reversed a prior $250 payment.

33.     The May 2015 monthly statement did not state that the interest rate and monthly payment would increase or the date of the next interest rate change, as is specified in the Modification.

34.     The May 2015 monthly statement was the first statement received by Plaintiff from Shellpoint specifying the amount of the late fee to be paid if the payment was not received by a date certain.

## MAKING HOME AFFORDABLE PROGRAM

35.     The Making Home Affordable Program ("MHA") was enacted for the purpose of helping homeowners avoid foreclosure, stabilizing the nation's housing market, and improving the country's economy. MHA requires participating mortgage lenders and servicers, like Shellpoint, to give borrowers the meaningful opportunity to potentially reduce their monthly mortgage payments following a period of financial hardship in order to avoid foreclosure. One of the foreclosure alternatives offered under MHA is the Home Affordable Modification Program

("HAMP"), which allows eligible borrowers to modify the terms of their mortgage in order to make the loan more affordable given the borrowers' particular financial circumstances/difficulties.

36.     As part of MHA and HAMP, Guideline 3.1.1 provides in pertinent part, "[a] servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until ... [t]he borrower is evaluated for HAMP and is determined to be ineligible for the program."

37.     As part of MHA and HAMP, Guideline 9.3.3 provides in pertinent part, "[s]ervicers may not charge the borrower to cover the administrative costs incurred in connection with HAMP. The servicer pays and will not be reimbursed for any actual out-of-pocket expenses, including, but not limited to, any required notary fees, recordation fees, title costs, property valuation fees, credit report fees, or other allowable and documented expenses."

## THE CALIFORNIA HOMEOWNER'S BILL OF RIGHTS

38.     Following the downturn of the economy in 2007 after the real estate market crashed, the federal government along with numerous states began requiring banks and mortgage lenders/servicers to substantively change and improve their servicing standards relating to mortgages, loan modifications, and foreclosure prevention. Indeed, according the California Legislative Counsel's Digest, the California Legislature found that:

> (a) California is still reeling from the economic impacts of a wave of residential property foreclosures that began in 2007. From 2007 to 2011 alone, there were over 900,000 completed foreclosure sales. In 2011, 38 of the top 100 hardest hit ZIP Codes in the nation were in California, and the current wave of foreclosures continues apace. All of this foreclosure activity has adversely affected property values and resulted in less money for schools, public safety, and other public services. In addition, according to the Urban Institute, every foreclosure imposes significant costs on local governments, including an estimated nineteen thousand two hundred twenty-nine dollars ($19,229) in local government costs. And the foreclosure crisis is not over; there remain more than two million "underwater" mortgages in California.

(b) It is essential to the economic health of this state to mitigate the negative effects on the state and local economies and the housing market that are the result of continued foreclosures by modifying the foreclosure process to ensure that borrowers who may qualify for a foreclosure alternative are considered for, and have a meaningful opportunity to obtain, available loss mitigation options. These changes to the state's foreclosure process are essential to ensure that the current crisis is not worsened by unnecessarily adding foreclosed properties to the market when an alternative to foreclosure may be available. Avoiding foreclosure, where possible, will help stabilize the state's housing market and avoid the substantial, corresponding negative effects of foreclosures on families, communities, and the state and local economy.

(c) This act is necessary to provide stability to California's statewide and regional economies and housing market by facilitating opportunities for borrowers to pursue loss mitigation options.

39. On July 11, 2013, California Governor Jerry Brown signed into law the "Homeowner's Bill of Rights" AB 278/SB 900 (the "Homeowner's Bill of Rights"). Attorney General Kamala Harris, along with the leadership of both the Assembly and the Senate sponsored the Homeowner's Bill of Rights. The Homeowner's Bill of Rights took effect January 1, 2013 and amended the California Civil Code to make significant changes to non-judicial foreclosure protocols and servicing processes for first lien residential mortgage loans.

40. The purpose of the Homeowner's Bill of Rights is to provide protections for borrowers facing foreclosure, reform many aspects of the foreclosure process, and to ensure that borrowers' mortgages are fairly and accurately serviced.

41. As part of the Homeowner's Bill of Rights, California Civil Code Section 2924.11(e), provides in pertinent part, "[t]he mortgage servicer shall not charge any application, processing, or other fee for a first lien loan modification or other foreclosure prevention alternative."

**TRUTH-IN-LENDING ACT**

44. The Truth-in-Lending Act ("TILA"), which is contained in Title I of

the Consumer Credit Protection Act, is a federal law that was enacted on May 29, 1968.  TILA protects consumers in their dealings with lenders and creditors.  TILA mandates that credit and charge companies disclose certain information with regards to borrowers' accounts.  TILA applies to most types of credit, including closed-end credit (such as mortgages) and open-ended credit (such as credit cards).

45.     As part of TILA, 15 U.S.C. §1639(a)(2) provides in pertinent part, "the creditor shall disclose – (A) in the case of a credit transaction with a fixed rate of interest, the annual percentage rate and the amount of the regular monthly payment; or (B) in the case of any other credit transaction, the annual percentage rate of the loan, the amount of the regular monthly payment, a statement that the interest rate and monthly payment may increase, and the amount of the maximum monthly payment, based on the maximum interest rate allowed pursuant to section 3806 of title 12."

46.     As part of TILA, Section 1026.41(d)(1)(ii) of the Code of Federal Regulations provides in pertinent part, "[t]he periodic statement required by this section shall include ... [t]he amount of any late payment fee, and the date on which that fee will be imposed if payment has not been received."

47.     As part of TILA, Section 1026.41(d)(7)(iii) of the Code of Federal Regulations provides in pertinent part, "[t]he periodic statement required by this section shall include ... [t]he date after which the interest rate may next change."

48.     As part of TILA, 15 U.S.C. Section 1640 provides in pertinent part, "any creditor who fails to comply with any requirement under [TILA] ... is liable in an amount equal to the sum of – (1) any actual damage sustained by such person as a result of the failure; (2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction ... (iv) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $400 or greater than $4,000; or (B) in the case of a class action, such amount as the court may allow,

except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $1,000,000 or 1 per centum of the net worth of the creditor; (3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 or 1638(e)(7) of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court; and (4) in the case of a failure to comply with any requirement under section 1639 of this title, paragraph (1) or (2) of section 1639(c), or section 1639(c)(a) of this title, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material."

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this lawsuit on behalf of herself and the proposed class members under Rule 23(b)(1), Rule 23(b)(2), and Rule 23(b)(3), alternatively, of the Federal Rules of Civil Procedure.  The proposed class and subclasses consist of:

50.     All persons who have a residential mortgage loan agreement relating to real property located within California and which is owned and/or serviced by Shellpoint, and who, after January 1, 2013, either:

**Subclass 1:** received monthly billing statements from Shellpoint that did not state that the interest rate and monthly payment would change, or the date on which the interest rate would change, or the amount of any late fee should the regular payment due not be paid by a date specified;

**Subclass 2:** were billed for regular monthly payments in excess of the regular monthly payments specified in the borrower's loan modification agreements; and

**Subclass 3**: applied for and received a first lien loan modification and who were charged fees after the application was submitted in violation of California Civil Code §2924.11, HAMP Guideline 3.1.1 and HAMP Guideline 9.3.3.

51. Excluded from the class are defendants and any of their officers, directors and employees.

52. *Numerosity*. The members of the class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed class contains thousands of members. While the precise number of class members is unknown to Plaintiff, it is known to Shellpoint.

53. *Existence and Predominance of Common Questions of Law and Fact*. Common questions of law and fact exist as to all members of the class and predominate over any questions affecting only individual class members. All members of the class have been subject to the same conduct and their claims are based on standard form contracts. The common legal and factual questions include, but are not limited to, the following:

      (a)    whether Shellpoint's conduct breaches the Modification;

      (b)    whether Shellpoint's conduct constitutes violations of the laws asserted herein;

      (c)    whether Plaintiff and the class members have sustained monetary or property loss and the proper measure of that loss; and

      (d)    whether Plaintiff and the class members are entitled to declaratory and injunctive relief as to Shellpoint.

54. *Typicality*. Plaintiff's claims are typical of the claims of the members of the class in that they are members of the class that they seek to represent.

55. *Adequacy of Representation*. Plaintiff will fairly and adequately protect the interests of the members of the class. Plaintiff has retained counsel

experienced in the prosecution of this type of class action litigation. Plaintiff has no adverse or antagonistic interests to those of the class.

56. *Superiority*. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The damages or other financial detriment suffered by individual class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Shellpoint. Further, the adjudication of this action presents no unusual management difficulties.

57. Unless a class is certified, Shellpoint will retain monies received as a result of their conduct that was taken from Plaintiff and proposed class members. Shellpoint has acted or refused to act on grounds that are generally applicable to the class so that declaratory relief is appropriate to the class as a whole.

## FIRST CLAIM FOR RELIEF

### Violations of the Truth In Lending Act

58. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

59. At all times pertinent to this Complaint, Shellpoint was the assignee creditor of the mortgage, the Note, and underlying debt that Plaintiff entered into with Moneyline Lending Services, Inc.

60. On information and belief, Plaintiff alleges that Shellpoint is the current mortgage holder and creditor. In the Modification, Shellpoint identifies the "Current Lender Name" as "Shellpoint Mortgage Servicing" (Exhibit 1). The "Home Affordable Modification Agreement" also identifies Shellpoint as the actual lender. It states, "Lender or Servicer ("Lender"): Shellpoint Mortgage

Servicing ("Shellpoint")" (Exhibit 1). Shellpoint never identifies itself in the Modification as merely a servicer for another lender.

61.     At all times pertinent to this Complaint, Shellpoint was also a "servicer" within the meaning of Regulation X, 12 C.F.R. §1024.2(b) and Regulation Z, 12 C.F.R. §1026.36(c). At all times pertinent to this complaint, Shellpoint was not a "small servicer" within the meaning of the exemption provided by 12 C.F.R. §1026.41(e)(4).

62.     At all times pertinent to this Complaint, the Loan was a closed-end consumer transaction secured by a dwelling within the meaning of Regulation Z, 12 C.F.R. §1026.

63.     As the assignee creditor of the Loan, Shellpoint was required to comply with TILA and its implementing regulation.

64.     The monthly mortgage statements that Shellpoint provided Plaintiff are "disclosure statements" within the meaning of 15 U.S.C. 1641(a).

65.     Shellpoint violated its obligations to Plaintiff under TILA. Among other violations, Shellpoint violated 15 U.S.C. §1639 and 12 C.F.R. §1026.41(d) by failing to send Plaintiff monthly periodic statements that accurately disclose the monthly charges and fees owed on the Loan. Shellpoint's monthly periodic statements violated these Statutes as they: (A) failed to specify the amount to be charged as a late fee should Plaintiff make her regular monthly payment after the applicable period of time (12 C.F.R. §1026.41(d)(1)(ii)); and (B) failed to state that the interest rate and monthly payment may change and did not specify the day after which Plaintiff's interest rate would next change (15 U.S.C. §1639 and 12 C.F.R. §1026.41(d)(7)(iii)).

66.     Plaintiff has suffered actual damage as a result of these violations as more particularly described above and herein. Plaintiff is entitled to an award of statutory damages, including reasonable attorneys' fees and costs, as allowed under 15. U.S.C. §1640 of TILA.

## SECOND CLAIM FOR RELIEF

### Violations of Civil Code § 2924.11

67.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

68.     Part of the Homeowner's Bill of Rights, California Civil Code Section 2924.11(e) provides in pertinent part, "[t]he mortgage servicer shall not charge any application, processing, or other fee for a first lien loan modification or other foreclosure prevention alternative."

69.     Plaintiff applied for a loan modification on or about June 2013. Shellpoint was evaluating Plaintiff for a first lien loan modification beginning in February 2014 and Plaintiff's application was under consideration for a loan modification until at least August 29, 2014.

70.     On or about August 29, 2014, Plaintiff was approved for and entered into the Modification by and with Shellpoint under HAMP.  The Foreclosure Fee, which was paid by Plaintiff on December 10, 2014, is improper under the California Homeowners Bill of Rights, specifically California Civil Code Section 2924.11(e) as the Foreclosure Fee constitutes an "other" fee under Section 2924.11(e).

71.     The foregoing conduct was done purposefully, negligently and/or without regard to Plaintiff's and members of the class' rights under California law. Based on the foregoing, Shellpoint's conduct constitutes an uncorrected violation of California Civil Code Section 2924.11.

72.     As a result of Shellpoint's violations of California Civil Code Section 2924.11, Plaintiff and members of the class have incurred actual damages, in an amount to be determined at trial.

73.     Moreover, Plaintiff and members of the class are entitled to injunctive relief to enjoin continuing material violations of California Civil Code Section 2924.11, reasonable attorneys' fees, and costs associated with the prosecution of

this action pursuant to California Civil Code Section 2924.12.

## THIRD CLAIM FOR RELIEF

### Breach of Written Contract

74.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

75.    Plaintiff and class members, and Shellpoint on the other, are parties to a written, standardized agreements—the Modification.

76.    Plaintiff and class members gave consideration that was fair and reasonable, and have performed all promises, covenants and conditions required of them.  The Modification specified the amount of Plaintiff's regular monthly payment.  The Modification also specified that any prior late charges, fees, interest, etc., would be capitalized into Plaintiff's loan as of the effective date of the Modification.

77.    Shellpoint charged Plaintiff a $250 Foreclosure Fee (which was purportedly incurred while Plaintiff's loan modification submission was being reviewed by Shellpoint and prior to the formation of the Modification).  This fee was a breach of the Modification because it was not capitalized into Plaintiff's Loan as specified in the Modification and because it caused Plaintiff's regular monthly payment to be in excess of that specified in the Modification.  The Foreclosure Fee was also illegal as is alleged elsewhere in this complaint.

78.    As a result of Shellpoint's breaches of the Modification, Plaintiff and class members suffered and continue to suffer reasonable and foreseeable damages resulting from such breaches, including, costs and expenses incurred as a result of the charges included in their monthly mortgage payments to Shellpoint and other damages in an amount to be proven at trial.

79.    Alternatively, Plaintiff seeks specific performance of the Modification in the event the legal remedies are inadequate.

80.     Finally, Plaintiff is entitled to reasonable attorneys' fees in enforcing her contractual rights under the Modification.

## FOURTH CLAIM FOR RELIEF

### Violations of California Business and Professions Code § 17200

81.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

82.     At all times relevant hereto, Shellpoint was a lender and/or servicer who was in the business of providing or servicing residential mortgages to the general public and were acting within the scope of that business with regard to the Loan provided to Plaintiff.

83.     As set forth more fully above, Shellpoint engaged in unlawful and/or unfair business practices with respect to mortgage loan servicing and the foreclosure of residential real property by, among other things, the following:

a.     Violating California Civil Code §2924.11(e) by charging an application, processing, or other fee for a first lien loan modification;

b.     Violating 15. U.S.C. §1641 by failing to disclose that the interest rate and monthly payment may increase;

c.     Violating 12 C.F.R. §1026.41(d) by failing to provide monthly periodic statements accurately disclosing the monthly charges and fees owed on the Loan, including, but not limited to, failing to specify the amount to be charged as a late fee should Plaintiff make her regular monthly payment after the applicable period of time, and failing to specify the day after which interest rates may next change;

d.     Violating the common law, including breaches of the Modification by charging amounts in excess of the regular monthly payment specified in the Modification and by failing to

capitalize the Foreclosure Fee into the principal balance of
Plaintiff's Loan as required by the Modification; and

e.    Violating public policy such as MHA Guidelines 3.1.1 and
9.3.3 by referring the Loan to foreclosure before determining
borrowers to be ineligible for HAMP and charging
administrative costs in connection with HAMP.

84.    Shellpoint's acts, omissions, misrepresentations, and practices as
alleged herein also constitute "unfair" business acts and practices within the
meaning of Business & Professions Code Section 17200, *et seq*. in that its conduct
is substantially injurious to consumers, offends public policy such as MHA
Guidelines 3.1.1 and 9.3.3, and is immoral, unethical, oppressive, and
unscrupulous as the gravity of the conduct outweighs any alleged benefits
attributable to such conduct.  On information and belief, Shellpoint is a
participating servicer and lender under the MHA and HAMP program(s).

85.    As part of MHA, Guideline 3.1.1 provides in pertinent part, "[a]
servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure
sale unless and until ... [t]he borrower is evaluated for HAMP and is determined to
be ineligible for the program."  The Foreclosure Fee stemmed from cost of
Shellpoint supposedly referring the Loan to a foreclosure attorney or trustee while
Plaintiff's Loan was being reviewed by Shellpoint for a HAMP loan modification.
As indicated herein, Shellpoint offered Plaintiff a modification of the Loan, which
she accepted.  Therefore, Plaintiff was not determined to be ineligible for HAMP
under the MHA program and Shellpoint had no authority to refer the Loan to
foreclosure.  As such, Shellpoint unfairly collected the Foreclosure Fee from
Plaintiff.  In addition, MHA Guideline 9.3.3 provides in pertinent part, "[s]ervicers
may not charge the borrower to cover the administrative costs incurred in
connection with HAMP.  The servicer pays and will not be reimbursed for any
actual out-of-pocket expenses, including, but not limited to, any required notary

fees, recordation fees, title costs, property valuation fees, credit report fees, or other allowable and documented expenses." By charging Plaintiff the Foreclosure Fee, Shellpoint charged Plaintiff fees in violation of Guidelines 9.3.3.

86. Shellpoint's conduct caused and continues to cause substantial injury to Plaintiff and the class members. Plaintiff has suffered injury in fact and has lost money as a result of the unfair conduct as described herein.

87. As a direct, proximate and foreseeable result of the unfair and unlawful conduct of Shellpoint, its business acts and practices have caused injury to Plaintiff, the members of the class, and the general public. Shellpoint's conduct continues to cause substantial injury to Plaintiff and the class members. Therefore, Plaintiff and the other members of the class are also entitled to injunctive relief pursuant to Business & Professions Code Section 17203 in order to force Shellpoint to: (1) cease violating the above detailed laws; and (2) to abide by the terms of the Modification.

## FIFTH CLAIM FOR RELIEF
### Declaratory Relief

88. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

89. A controversy has arisen and now exists between Plaintiff and class members on the one hand and Shellpoint on the other. The controversy between the parties concerns the existing, standardized mortgage agreements between the parties and the parties' rights and duties under those contracts and Shellpoint's compliance with California Civil Code §2924.11, 15 U.S.C. §1639, and 12 C.F.R. §1026.41. Plaintiff and class members further contend that Shellpoint has breached the Modification as alleged herein. Plaintiff and class members also contend that Shellpoint violates the Modification by not complying with California Civil Code §2924.11, 15 U.S.C. §1639, and 12 C.F.R. §1026.41. Shellpoint disputes these contentions.

90.     Plaintiff and class members request a judicial determination of their rights and duties, and the rights and duties of absent class members and a declaration as to whether Shellpoint violates the Modification.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment:

A.     Certifying the class as requested herein;

B.     Awarding Plaintiff and the proposed class members damages;

C.     Awarding restitution to Plaintiff and the proposed class members;

D.     Awarding declaratory and injunctive relief as permitted by law or equity, including a judicial determination of the parties' rights and duties under the contract, enjoining defendants from continuing the unlawful practices as set forth herein (including the commencement and continuation of non-judicial foreclosure), ordering specific performance by Shellpoint, and directing Shellpoint to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Shellpoint by means of any act or practice declared by this Court to be wrongful;

E.     Awarding attorneys' fees and costs; and

F.     Providing such further relief as may be just and proper.

Dated: May 22, 2015                **HOFFMAN & FORDE**


_____/s/ Daniel Forde_____
DANIEL FORDE
3033 Fifth Avenue, Suite 225
San Diego, CA 92103
P:  (619) 546-7880
F:  (619) 546-7881

E: dforde@hoffmanforde.com

Attorneys for Plaintiffs

## **TRIAL BY JURY**

Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Dated: May 22, 2015                         **HOFFMAN & FORDE**

_____/s/ Daniel Forde_____
DANIEL FORDE
3033 Fifth Avenue, Suite 225
San Diego, CA 92103
P:  (619) 546-7880
F:  (619) 546-7881
E: dforde@hoffmanforde.com

Attorneys for Plaintiffs