1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

11

UN BOON KIM,                                    CASE NO. 15cv611-LAB (BLM)

12
                                    Plaintiff,    **ORDER GRANTING IN PART MOTION**
                                                **TO DISMISS OR STRIKE**
13          vs.
                                                **[DOCKET NUMBER 17.]**
14
SHELLPOINT PARTNERS, LLC,

15                                  Defendant.

16

17          Plaintiff Un Boon Kim brought this putative class action, bringing claims under the

18  Truth in Lending Act (TILA) as well as various California laws.  When Defendant Shellpoint

19  Partners, LLC filed a motion to dismiss the original complaint (Docket no. 13), Kim filed an

20  amended complaint ("FAC," Docket no. 15), which is now the operative complaint.

21  Shellpoint filed a motion to dismiss the FAC for lack of jurisdiction and failure to state a

22  claim, or in the alternative to strike (the "Motion").  The Motion is now fully briefed and ready

23  for disposition.

24          The FAC primarily relies on federal question and supplemental jurisdiction as giving

25  rise to subject matter jurisdiction. Secondarily it relies on diversity jurisdiction under the Class

26  Action Fairness Act.

27  / / /

28  / / /

**Factual Background**

   **The Note and Deed of Trust**

   In March 2004 Kim and her late husband took out a home loan for approximately $400,000.  (FAC, ¶ 10; Docket no. 18-1, Exhibits B & C.)  They executed a note and deed of trust in favor of Moneyline Lending Services, Inc.  (FAC, ¶ 11.)  Those documents provide that the "note holder" and "lender" may charge the borrower for expenses incurred in enforcing the note.  (Docket no. 18-1, Exhibit B, ¶ 7(E) & Exhibit C, ¶ 14.)  The deed of trust contains the following notice and cure provision:

> Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party . . . of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

(Docket no. 18-1, Exhibit C, ¶ 20.)  Paragraph 13 provides that "[t]he covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender."  With respect to notice, the deed of trust specifies that "[a]ll notices given by the Borrower or Lender in connection with this Security Instrument must be in writing . . . .  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower."  (*Id*., ¶ 15.)  Kim alleges that Shellpoint never provided an address to which notices should be sent, excusing her noncompliance with the notice and cure requirement.  (FAC, ¶ 12.)  Shellpoint has provided a February 2014 letter, which contains its contact address and is addressed to Kim, and declares that it sent the letter to her.  (Docket no. 17-2; Docket no. 17-3, Exhibit I.)

   **Alleged Transfers**

   Kim alleges that Moneyline is no longer in business, and that it transferred the loan to Bank of America, who then transferred the loan to Resurgent Mortgage Servicing in January 2014, who then transferred the loan to Shellpoint in February 2014.  (FAC, ¶¶ 11,

14.)  To support her allegation that Shellpoint is a lender, Kim provides an executed loan modification agreement ("LMA"), which lists Shellpoint as the "current lender," and in another section, as the "lender or servicer."  (FAC, Exhibit 1.)  She also provides a "voluntary lien report," which refers to Shellpoint as the lender.  (FAC, Exhibit 2.)  Shellpoint disputes that it owns the loan, and has submitted a declaration asserting that it acts only as a servicer of the loan, not as lender or beneficiary.  (Docket no. 17-2, ¶ 3.)

### Default and Loan Modification

In March 2010, Kim defaulted on the loan, owing $22,138.96 in overdue payments, and her servicer initiated foreclosure proceedings.  (Docket no. 18-1, Exhibit D.)  Kim alleges that she began to discuss a loan modification with her lender in June 2013, and executed a loan modification agreement ("LMA") with Shellpoint in August 2014.  (FAC, ¶¶ 14, 15.)  The LMA provides "[t]hat all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect," and that the loan documents as modified by the LMA are "duly, valid binding agreements."  (FAC, Exhibit 1, §§ 4(E)-(F).)  Under the LMA, "[t]he modified principal balance of [the] Note" became $447,086.20, which includes "all amounts and arrearages that will be past due as of the Modification Effective Date . . . ." (*Id*., § 3(B).)  The LMA sets forth a payment schedule for the loan, which included total monthly payments of $1,840.65 and 2% interest rate for the first five years.  (*Id*., § 3(C).)  The LMA payment schedule also sets forth the date and amount of each subsequent interest rate change for the life of the loan.  (*Id*.)  Kim alleges that, under the LMA, any prior late charges, fees, and principal payments were required to be capitalized into the principal balance of the loan as of the effective date of the modification.  (FAC, ¶ 16.)

### Monthly Statement Fee

In November 2014, Shellpoint sent Kim a monthly statement, which reflected the modified mortgage terms, but also included a $250 charge, which was described as a "trustee assess."  (FAC, ¶ 20 & Exhibit 3.)  Kim alleges that she called Shellpoint about the charge, and a representative informed her that it related to legal fees associated with her

default.  (*Id.*, ¶ 22.)  She contends that the representative told her that, although no foreclosure occurred, her loan was referred to an attorney for foreclosure on August 17, 2014, and she was responsible for legal fees up to the point of modification.  (*Id.*)  But, she alleges, Shellpoint didn't actually incur the costs it passed along to her.  (*Id.*)  She alleges that she paid the $250 trustee assess to avoid delinquency.  (*Id.*, ¶ 24.)  Her next monthly statement, however, referred to her $250 payment as a "principal only payment," and reflected a $250 overdue balance.  (*Id.*, ¶ 26.)  Kim alleges that the $250 fee appeared in the monthly statement Shellpoint sent to her in December 2014, and January, February, and March 2015, and she paid the fee each time.  (*Id.*, ¶¶ 26, 28, 30.)  She alleges that the monthly statement Shellpoint sent to her in May 2014 finally credited the $250 payment to the trustee assess, applied another $250 to principal, and reversed one prior $250 payment. She alleges that the monthly statements she received from December 2014 to May 2015 didn't state that the interest rate and monthly payment would increase, or the date of the next interest rate change.  (*Id.*, ¶¶ 25, 27, 29, 31, 33.)  She alleges that the monthly statements she received from December 2014 to April 2015 didn't state the amount of any late fee that Kim would incur if she didn't pay her bill on time.  (*Id.*, ¶¶ 25, 27, 29, 31, 34.)

**Kim's Claims**

Kim sued Shellpoint on behalf of herself and

> All persons who have a residential mortgage loan agreement relating to real property located within California and which is owned and/or serviced by Shellpoint, and who, after January 1, 2013, either:
>
> Subclass 1: received monthly billing statements from Shellpoint that did not state that the interest rate and monthly payment would change, or the date on which the interest rate would change, or the amount of any late fee should the regular payment due not be paid by a date specified;
>
> Subclass 2: were billed for regular monthly payments in excess of the regular monthly payments specified in the borrower's loan modification agreements; and
>
> Subclass 3: applied for and received a first lien loan modification and who were charged fees after the application was submitted in violation of California Civil Code §2924.11, HAMP Guideline 3.1.1 and HAMP Guideline 9.3.3.

(*Id.*, ¶ 50.)  Her FAC asserts five causes of action.  First, she contends that Shellpoint

violated TILA because the monthly statements "failed to specify the amount to be charged as a late fee should [she] make her regular monthly payment after the applicable period of time" and "failed to state that the interest rate and monthly payment may change and did not specify the day after which Plaintiff's interest rate would next change." (*Id*., ¶ 65.)  Second, she contends that Shellpoint violated the Homeowner's Bill of Rights (HOBR), California Civil Code Section 2924.11(e) by including the $250 fee on her December 2014 through March 2015 monthly statements because the fee was an "other fee for a first lien loan modification or other foreclosure prevention alternative." (*Id*., ¶¶ 68, 70.)  Third, she contends that Shellpoint breached the LMA by charging the $250 fee because the LMA required Shellpoint to capitalize all unpaid fees into the principal balance. (*Id*., ¶¶ 75–77.)  Fourth, she contends that Shellpoint violated California's unfair competition law, Cal. Bus. & Prof. Code § 17200 *et seq*. (UCL) by violating TILA and the HOBR, breaching the LMA, referring her loan to foreclosure before determining whether she was eligible for the Home Affordable Modification Program (HAMP), and charging administrative costs in connection with HAMP. (*Id*., ¶ 83.)  Finally, she seeks a declaration as to whether Shellpoint violated the LMA. (*Id*., ¶ 90.)

**Shellpoint's Motion to Dismiss**

Shellpoint has moved to dismiss, arguing: (1) Kim doesn't have Article III standing under TILA because that statute only establishes a private right of action against lenders, and Shellpoint contends it's only acting as servicer; (2) Kim doesn't have Article III standing to bring the HOBR, UCL, breach of contract, and declaratory relief claims because the challenged fee wasn't a "fee for a first lien loan modification or other foreclosure prevention alternative" or an administrative HAMP fee; (3) Kim fails to state a claim because she hasn't provided notice and an opportunity to cure; (4) Kim's TILA claim should be dismissed under Fed. R. Civ. P. 12(b)(6) because it doesn't provide for a private right of action against servicers; (5) Kim's HOBR claim should be dismissed under Fed. R. Civ. P. 12(b)(6) because the trustee assess isn't an administrative HAMP fee; (6) Kim's breach of contract claim should be dismissed under Fed. R. Civ. P. 12(b)(6) because the trustee assess didn't breach

1  any term of the LMA; (7) Kim's UCL claim should be dismissed because it challenges
2  Shellpoint's lawful exercise of its rights under the LMA; and (8) Kim's declaratory relief claim
3  should be dismissed because it's not an independent cause of action and is duplicative of
4  her other claims.   Arguments 1 and 2 are brought under Fed. R. Civ. P. 12(b)(1).   In the
5  alternative, Shellpoint requests that certain allegations in the FAC be stricken as immaterial,
6  impertinent, or for lack of ascertainability as to the class allegations.

7  **Request for Judicial Notice**

8          Shellpoint seeks judicial notice of a redline comparison of Kim's original complaint and
9  her FAC, (Docket no. 18-1, Exhibit A), two documents that were provided with, and
10 authenticated by, Kim's original complaint, but removed in her FAC, (*id.*, Exhibits B & C), and
11 several publically recorded documents related to Kim's loan (*id.*, Exhibits D–H).   It also
12 provides and authenticates a notice of transfer of servicing to Shellpoint, (Docket no. 17-2;
13 Docket no. 17-3, Exhibit I), and an invoice that Shellpoint declares reflects filing fees it
14 incurred in relation to Kim's default, (Docket no. 17-2; Docket no. 17-3, Exhibit J).   The Court
15 takes judicial notice of Exhibit A because it's "capable of accurate and ready determination
16 by resort to resources whose accuracy cannot reasonably be questioned."   Fed. R. Evid.
17 201(b)(2); *In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at *2 (D. Ariz. July 5, 2006).
18 The Court takes judicial notice of Exhibits B and C because "the Court may take judicial
19 notice of its own records."   *Jackson v. Cate*, 2012 WL 2529360, at *3 (C.D. Cal. Mar. 28,
20 2012) report and recommendation adopted, 2012 WL 2564594 (C.D. Cal. June 29, 2012).
21 And the Court takes judicial notice of Exhibits D through H because "[f]ederal courts routinely
22 take judicial notice of facts contained in publically recorded documents . . . because they are
23 matters of public record, and are not reasonably in dispute."   *Farber v. JPMorgan Chase
24 Bank NA*, 2014 WL 68380, at *3 (S.D. Cal. Jan. 8, 2014).   Exhibits I and J aren't the proper
25 subject of judicial notice.

26 **Legal Standards**

27          A Rule12(b)(6) motion to dismiss tests the sufficiency of the complaint.   *Navarro v.*
28 *Block*, 250 F.3d 729, 732 (9th Cir. 2001). Under Fed. R. Civ. P. 8(a)(2), only "a short and

plain statement of the claim showing that the pleader is entitled to relief," is required, in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id*. at 555. "[S]ome threshold of plausibility must be crossed at the outset" before a case is permitted to proceed. *Id*. at 558 (citation omitted). The well-pleaded facts must do more than permit the Court to infer "the mere possibility of misconduct;" they must show that the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

When determining whether a complaint states a claim, the Court accepts all allegations of material fact in the complaint as true and construes them in the light most favorable to the non-moving party. *Cedars–Sinai Medical Center v. National League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007) (citation omitted). But the Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint," and does "not . . . necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citations and quotation marks omitted). The Court looks to the contents of the complaint as well as any "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading . . . ." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). The Court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Rule 12(b)(1) requires a court to dismiss a complaint if the court lacks subject matter jurisdiction over the claims at issue.  A court lacks subject matter jurisdiction if a plaintiff lacks Article III standing. *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012). "[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Injury to unnamed members of

15cv611

the proposed class doesn't establish standing.  *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 884 (9th Cir. 2001).

"Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  With a facial attack, courts inquire whether the allegations contained in a complaint are sufficient on their face to invoke federal jurisdiction.  *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).  With a factual attack, however, "the defendant may introduce testimony, affidavits, or other evidence to dispute the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."[1]  *Id.* (internal brackets and quotation marks omitted).

"The Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Redundant allegations are those that are "needlessly repetitive or wholly foreign to the issues involved in the action." *J & J Sports Prods., Inc. v. Nguyen*, 2014 WL 60014 at *8 (N.D.Cal. Jan.7, 2014). "Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993). Finally, impertinent matters are those that "do not pertain, and are not necessary, to the issues in question." *Id*.

Motions to strike can be an appropriate means of testing class claims.  *See Brown v. Hain Celestial Group, Inc.*, 913 F. Supp. 2d 881, 888 (N.D. Cal., 2012) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).  For example, if it is apparent at this stage that the ascertainability requirement for class certification will not be met, striking a class allegation is permitted.  *Id.*  Ascertainability refers to the ability of potential class members to identify themselves as having a right to recover based on the class description.  *See Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1303 (D. Nev. 2014). "Determination of class membership should not entail individual inquiries" and class definitions based on the merits of individual members' claims are among those that will

---

[1] The Court could consider Exhibits I and J in support of a factual jurisdictional attack, but as discussed below, the jurisdictional attack is really aimed at the merits and not at jurisdiction.

1    usually fail to meet the ascertainability requirement. *Id*. *See also Bias v. Wells Fargo & Co.*,

2    312 F.R.D. 528, 538 (N.D. Cal. 2015) (holding that ascertainability requires that class

3    members be "readily identifiable by objective criteria" and that it be "objective feasible to

4    determine whether a particular person" is a class member).

5         In addition to jurisdictional challenges the Motion raises, the Court is obligated to raise

6    and address any other jurisdictional questions, *sua sponte* if necessary. *See Chapman v.*

7    *Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (en banc). And it must address

8    jurisdictional problems before proceeding to the merits. *See Steel Co. v. Citizens for a Better*

9    *Environment*, 523 U.S. 83, 93–94 (1998). The party seeking to invoke the Court's jurisdiction

10   (Kim) bears the burden of establishing it. *See Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th

11   Cir. 2001).

12   **Discussion**

13        **Jurisdiction**

14        The Court is not permitted to assume hypothetically that jurisdiction exists in order to

15   reach easier merits questions. *Steel Co.*, 523 U.S. at 93–94. Rather, the Court must

16   address jurisdiction first, before proceeding to the merits. *Id*.

17        The Court's jurisdiction depends primarily on the presence of a substantial federal

18   question. Here, that is a TILA claim, the first claim for relief. The claims identified as

19   supplemental arise out of the same series of transactions as the TILA claim. But they are

20   state-law claims, not federal. The second and third claims for relief arise entirely under state

21   law. The fourth claim is a claim for unfair competition under Cal. Bus. & Prof. Code §§ 17200

22   *et seq.*, which could be established without showing a violation of federal law. *See Rains v.*

23   *Criterion Systems, Inc.*, 80 F.3d 339, 346 (9th Cir. 1996). The fifth and final claim is a claim

24   for declaratory relief, rather than a separate cause of action. It raises a federal question only

25   to the extent it requests a declaration that Shellpoint has violated TILA. It is  derivative of the

26   principal TILA claim and can only succeed if the principal TILA claim does.

27        Kim's fallback position is that the Court can exercise diversity jurisdiction under CAFA,

28   because "at least one member of the class of plaintiffs is a citizen of a state different from

any defendant." (FAC, ¶ 4.)  But diversity of citizenship is not adequately pled. For CAFA's purposes, Shellpoint is a citizen both of the state where it has its principal place of business and the state under whose laws it is organized.  *See* 28 U.S.C. § 1332(d)(10).  Shellpoint is alleged to have its headquarters in South Carolina, but the state under whose laws it is organized is never identified.  (FAC, ¶ 8.)  It is therefore clear that, under CAFA, Shellpoint is a citizen of South Carolina and possibly one other state.   But the FAC makes the conclusory allegation that "Shellpoint is a citizen of the state of Georgia." (*Id*.)  This <u>might</u> mean that Shellpoint is organized under Georgia laws, but if so, that would make Shellpoint a citizen of both South Carolina and Georgia, not just Georgia. This hole in the FAC's allegations leaves open the possibility, however, that Shellpoint is organized under California law. If that were the case, Kim and Shellpoint would both be California citizens and the diversity allegation would be defective. Moreover, as discussed below, some claims are being dismissed.  Because only the total amount in controversy is pled, there is no way to know whether the remaining claims would meet the threshold.

The Motion brings two jurisdictional challenges, both related to Article III standing. Both, however, depend on a factual showing that, contrary to the FAC's allegations, Shellpoint was merely the loan servicer, not the lender, and that TILA provides no private right of action against servicers.  In addition, Shellpoint argues that the statements attached to the FAC show that the late fee was disclosed as required by TILA.  Shellpoint also argues that Kim was never charged any late fees or loan modification fees.

The attack on standing, however, is not properly a factual jurisdictional attack, but instead is really a merits-based defense. While it is correct to say that if the FAC's allegations of wrongdoing are false, Kim has suffered no injury, whether a plaintiff has pled her claim is really a question of the merits and is not properly analyzed as jurisdictional. *See Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) (explaining that standing analysis cannot be used to disguise merits analysis, the focus of which is on whether relief can be granted, provided the allegations are true). *See also Warren*, 328 F.3d at 1139 (explaining that, where jurisdiction is intertwined

1  with the merits, the Court assumes the truth of the allegations in a complaint unless
2  controverted by undisputed facts in the record).

3  **Merits of TILA Claim**

4  The original complaint alleged that Shellpoint was sued for its actions as a loan
5  servicer only. (Compl., ¶ 1.)  When Shellpoint correctly pointed out that TILA provides for
6  a private right of action against creditors or lenders, not loan servicers, *see Gale v . First*
7  *Franklin Loan Servs.*, 701 F.3d 1240, 1245–46 (9th Cir. 2012), Kim amended to allege that
8  Shellpoint was also an assignee and creditor.

9  Although Shellpoint continues to argue it is merely a loan servicer, it has raised a new
10  defense.  Under the deed of trust's "notice and cure" provision, cited above, (*see* Docket no.
11  18-1, Exhibit C, ¶ 20), the Borrower (Kim) agrees to give notice to the Lender (allegedly,
12  Shellpoint) and to allow the Lender to cure any breach before filing suit.  The LMA reaffirmed
13  this requirement.  But the notice and cure provision only applies to claims arising "from the
14  other party's actions pursuant to this Security Instrument or that alleges that the other party
15  has breached any provision of, or any duty owed by reason of, this Security Instrument . . . ."
16  (*Id*.)  The FAC never alleged compliance with this requirement, and Kim concedes she did
17  not comply with it before filing suit.  (*See* Docket no. 22 at 8:26–28 (arguing that Kim brought
18  violations to Shellpoint's attention on June 15, 2015).)  She argues, however, that notice was
19  never required because she is not seeking to set aside the mortgage, because the original
20  lender was no longer in business, and because Shellpoint did not provide her with a new
21  address to mail notices to. Both these arguments fail under the plain language of the
22  agreement.

23  First, the notice and cure clause is broad, and applies to any claim arising out of the
24  agreement.  Second, the clause requires written notice to the lender at an address specified
25  in the agreement.  Shellpoint says it sent her an updated address. (*See* Docket no. 17-1 and
26  17-2). At this stage of the case, the Court is not evaluating this evidence.  But it really makes
27  no difference to the analysis.  Assuming Kim received such a letter, she should have given
28  notice at the address it provided.  Assuming she did not receive such a letter, she should

15cv611

1    have sent her notice to the last address she had, *i.e.*, the one in the agreement. If she had

2    provided written notice to Shellpoint at that address, she could at least argue she had

3    complied with the agreement's literal terms, and could try to show Shellpoint did not actually

4    send her the notification letter it says it did.[2] Alternatively, if she had provided written notice

5    to Shellpoint at the mailing address Shellpoint had given her for other purposes (*see* FAC,

6    Exhibit 7) or had asked Shellpoint if there was a new address she should send notices to,

7    she would have had a strong argument. Instead, the best she can say is that she told

8    Shellpoint about one of her complaints in a phone call, which she believes Shellpoint's

9    representatives wrote down and put into Shellpoint's computer system. (FAC, ¶¶ 22–23.)

10   She does not allege any good reason for failing to give the required written notice before

11   filing suit.

12         Kim also argues that her notification of Shellpoint on June 15, 2015, during the

13   pendency of this action, amounts to substantial compliance. But this argument, if accepted,

14   would gut the "notice and cure" provision, the purpose of which is to give each party an

15   opportunity to cure problems and prevent the need for litigation.

16         Kim has a better argument, however; she contends the TILA duties are statutory, and

17   do not arise under or out of the deed of trust.  While the question is close, this appears to

18   be correct, at least as to the TILA claim, because TILA obligations arise under statute, not

19   under the agreement. *See Sigwart v. U.S. Bank Nat'l Ass'n*, 2014 WL 1322813, at *6–7 (D.

20   Haw. Mar. 31, 2014) (citing *St. Breux v. U.S. Bank, Nat'l Ass'n*, 919 F. Supp. 2d 1371, 1375

21   (S.D. Fla., 2013)).

22         Turning to the merits of her claim, Kim alleges Shellpoint's monthly statements did not

23   accurately disclose the monthly charges and fees owed on the loan.  Specifically, she says

24   they failed to specify the amount to be charged as a late fee if she made a late payment,

25   failed to say that the interest rate and monthly payment may change, and did not specify the

26   day after which Kim's interest rate would next change. (FAC, ¶ 65.) But Shellpoint correctly

27   ─────────────────────

28         [2] It is unknown whether mail sent to the address provided in the agreement would
     have been forwarded to Shellpoint. Kim appears to have assumed it would not, and did not
     try.

points out that documents attached to the complaint show at least some of these allegations are inaccurate. Specifically, two of the four attached statements state that a late fee of $0.00 would be assessed for late payments (FAC, Exhibits 5–6), and one gives the required late fee information.  (*Id*., Exhibit 7.)  To the extent Kim's TILA claims rely on these two alleged inaccuracies, they are subject to dismissal.

For Kim to have standing, and the Court to have jurisdiction over her TILA claims, she must show a redressable injury. *See Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S.Ct. 1377, 1386 (2014). While the FAC seeks for actual damages, it does not explain how the alleged TILA violations caused Kim actual, compensable losses. TILA does provide for statutory damages, *see* 15 U.S.C. § 1640(a)(2)(A), and the FAC requests them (*see* FAC, ¶ 66.) The Court infers this means she is asking for at least some money to which the statute entitles her, although she has not attempted to calculate the amount for herself or for the class.

**Merits of HOBR and UCL Claims**

Issues of fact remain with respect to Kim's HOBR, UCL claims, and breach of contract claims. The FAC alleges that, after Kim defaulted, she engaged in discussions with Shellpoint to avoid foreclosure, those discussions resulted in a loan modification, where Shellpoint agreed to capitalize all prior fees into the modified principal balance of the loan, but despite that agreement, Shellpoint charged a $250 fee over and above the modified monthly amount due.  Taken in the light most favorable to Kim, these allegations plausibly suggest that the $250 fee was a "fee for a first lien loan modification or other foreclosure prevention alternative," or an administrative HAMP fee, or a sum that should have been capitalized into the modified principal balance.  And the third conclusion is consistent with Kim's allegation that Shellpoint told her the charge arose because it referred the case to an attorney for foreclosure on August 17, 2014.  Shellpoint submits a declaration and invoice that indicates the $250 charge was for document recording services related to Kim's default, which a third party performed in February 2014, but didn't bill Shellpoint for until October 2014.  If accurate, the document suggests that the $250 charge wasn't for a loan

15cv611

1   modification or foreclosure prevention alternative, wasn't an administrative cost related to

2   Kim's eligibility for HAMP, and didn't breach the LMA because the fee wasn't past due as of

3   the modification effective date.  But the Court can't consider Shellpoint's evidence at this

4   stage of the case.[3]  And as with Kim's TILA claim, the deed of trust's notice and cure

5   provision doesn't require dismissal of the HOBR and UCL claims because they arise under

6   statute, not the agreement.  Thus, Kim's HOBR and UCL claims are not subject to dismissal

7   at this stage.

8                    **Merits of Breach of Contract Claim**

9            Although some factual disputes remain with regard to Kim's breach of contract claim,

10  Shellpoint has a meritorious defense.  Unlike Kim's TILA claim, her breach of contract claim

11  clearly does arise from the LMA. If, as she alleges, Shellpoint was acting as a lender, she

12  was obligated to comply with the notice and cure provision before filing suit.  Because she

13  did not, this claim must be dismissed. But because it is not clear that this claim cannot be

14  saved by amendment, she will be given leave to amend it.

15                   **Declaratory Relief Claim**

16           Kim's claim for declaratory relief is not a cognizable cause of action.  Declaratory

17  judgment is appropriate when parties seek to resolve "an actual controversy that has not

18  reached a stage at which either party may seek a coercive remedy and in cases where a

19  party who could sue for coercive relief has not yet done so."  *See Seattle Audubon Soc. v.*

20  *Moseley*, 80 F.3d 1401, 1405 (9th Cir. 1996).  "Declaratory judgment is not a corrective

21  remedy and should not be used to remedy past wrongs." *Williams v. Bank of Am.*, 2013 WL

22  1907529, at *5-6 (E.D. Cal. May 7, 2013).  Instead, "[t]he purpose of a declaratory judgment

23  is to set forth a declaration of future rights." *Id*. (emphasis added).  Kim seeks a "declaration

24  as to whether Shellpoint violates the [LMA]," which duplicates her other causes of action and

25  seeks to remedy past wrong.

26  _____

27         [3] Before amending, Kim should take reasonable steps to investigate whether
    Shellpoint's contentions are correct, and, in light of the Court's analysis, whether she can in
28  good faith make the factual allegations she needs to make in order for these claims to
    succeed.

**Motion to Strike: MHA and HBOR Background Allegations**

The Motion asks the Court to strike ¶¶ 23–28 of the complaint as immaterial; apparently, they are referring to FAC ¶¶ 38–41. Even if this section is not strictly necessary, however, it is not so impertinent as to require that it be stricken.

**Motion to Strike: Class Allegations**

The Motion also asks the Court to strike class allegations, on the basis that the class is unascertainable, and because Kim cannot represent them. The FAC names three subclasses, described above.

Part of the description of all three classes is that their mortgage loans be "owned and/or serviced by Shellpoint . . . ." (FAC, ¶ 50.) This is a problem for the first subclass, whose claims are based on lack of proper TILA disclosures in periodic statements. As discussed above, only creditors, not servicers can be liable under this provision. The class definition does not distinguish between those whose loans were owned by Shellpoint (and who therefore may have TILA claims) and those whose loans were owned by another creditor (and who therefore have no TILA claims against Shellpoint). Because Kim alleges Shellpoint owned her mortgage loan and committed some TILA violations, she might be able to serve as representative for this subclass. This allegation will not be stricken, although it must be amended to include only those with valid TILA claims against Shellpoint as lender.

The second subclass is defined as those billed for regular monthly payments in excess of the regular monthly payments specified in the borrower's loan modification agreements. This appears to be based on Kim's highly individualized claim regarding the $250 "trustee assess" fee. Whether a putative subclass member was improperly excessively billed is a highly individualized question, and it is unlikely very many were injured in the way Kim alleges she was. Ascertaining who the class members are would require inquiry into each potential member's agreement to determine whether any charges imposed were "in excess of the regular monthly payments specified in the borrower's loan modification agreements." *See Kristensen*, 12 F. Supp. 3d at 1303. This is not administratively feasible, and potential class members would not know, based on the class definition, whether they

were entitled to relief.  In the absence of some kind of allegation of a widespread practice or policy of charging "trustee assess" fees, or some other particular kind of fee readily identifiable as improper, this is inherently not the kind of claim that can be decided by class action. *Compare Bias*, 312 F.R.D. at 539 (finding class was ascertainable when it was defined as those who were charged a broker's price opinion fee).

The third consists of those who applied for and received a first lien loan modification and who were charged illegal fees after submission of their application.  Because there are potentially many governing documents and many ways for fees to be illegal, this too requires a highly individualized inquiry.  *See Kristensen*, 12 F. Supp. 3d at 1303. For the same reasons, this subclass fails the ascertainability requirement even at this early stage of litigation.

**Conclusion and Order**

For the reasons set forth above, the Motion is **GRANTED IN PART**.

The Court finds it can exercise federal question jurisdiction on the basis of Kim's TILA claims, and supplemental jurisdiction over the remaining claims. But diversity jurisdiction has been inadequately pled; if Kim believes the Court can exercise diversity jurisdiction, she should plead it when amending her complaint.

The TILA claims are partially based on alleged TILA violations that do not in fact violate TILA.  To the limited extent discussed above, they are **DISMISSED**, but for the most part they are not subject to dismissal.  If she amends, she should specifically allege how she was injured so as to entitle her to actual damages for the TILA violations.  She must also explain under which provision(s) of § 1640(a)(2)(A)(I) she is claiming damages, and if possible, calculate them. The HOBR and UCL claims will not be dismissed at this time.  The breach of contract claim is **DISMISSED WITHOUT PREJUDICE**, but the declaratory relief claims are **DISMISSED WITHOUT LEAVE TO AMEND**.

The request to strike is **GRANTED IN PART**.  Only class allegations pertaining to subclasses 2 and 3 are **STRICKEN**.

/ / /

15cv611

1       No later than **21 calendar days from the date this order is issued**, Plaintiff may file

2  a second amended complaint omitting claims dismissed without leave to amend, and

3  stricken class allegations.

4       When amending, Plaintiff should take into account the evidence she is now aware of,

5  and should include only facts and claims she can in good faith plead.

6

7       **IT IS SO ORDERED**.

8  DATED:  March 30, 2016

9

10  **HONORABLE LARRY ALAN BURNS**
United States District Judge